NOT FOR PUBLICATION                              (Doc. Nos. 58, 59, 83)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

_____
                                        :
COMMERCE BANCORP, LLC, f/k/a            :
COMMERCE BANCORP, INC,                  :
TD BANK, N.A., and TD BANKNORTH,        :
INC.,                                   :
                    Plaintiffs,         :      Civil No. 08-5628 (RBK/KMW)
                                        :
           v.                           :      **OPINION**
                                        :
VERNON W. HILL,                         :
                                        :
                    Defendant.          :
_____ :

**KUGLER**, United States District Judge:

 This matter comes before the Court upon (1) a Motion filed by Defendant Vernon W. Hill for Partial Summary Judgment on Counts One Through Five of the Amended Complaint of Plaintiffs Commerce Bancorp, LLC, TD Bank, N.A., and TD Banknorth, Inc. (collectively, "Plaintiffs"); (2) Hill's Motion for Partial Summary Judgment on Count Six of the Amended Complaint; and (3) Hill's Motion to Dismiss Counts One Through Five of the Amended Complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). The Amended Complaint consists of six counts alleging trademark and copyright infringement, unfair competition, and breach of contract. For the reasons expressed below, Hill's Motion to Dismiss shall be denied, Hill's Motion for Partial Summary Judgment on Count Six shall be denied, and Hill's Motion for Partial Summary Judgment on Counts One Through Five shall be granted in part and denied in part.

## I.      BACKGROUND

This matter arises out of the messy divorce of banking entrepreneur Vernon W. Hill and the bank he founded and grew to monstrous proportions over a thirty-year leadership period.

Hill founded Commerce Bancorp, Inc. ("Commerce Bank") in 1973.  For many years, Hill served as Commerce Bank's Chairman and CEO.  Commerce Bank was built upon a retail banking model.  In a nutshell, this model asked customers to sacrifice higher rates in exchange for increased convenience.  Amongst other things, Commerce Bank branch locations – readily identifiable by the red "C" logo – offered extended weekday and weekend operating hours, provided patrons access to an interactive coin-counting machine known as the "Penny Arcade," embraced an inclusive attitude towards customers' domestic pets, and encouraged customers to take the Bank's pens home with them.

In 2007, Commerce Bank terminated Hill.  In a July 3, 2007 letter drafted by Commerce Bank's lawyer, William Tambussi, Hill was informed that the Commerce Bank Board of Directors had held a special board meeting on June 28, 2007.  During that meeting, the Board had ratified a resolution terminating Hill's employment without cause.  The Tambussi Letter recognized an Amended and Restated Employment Agreement (the "Employment Agreement") between Commerce Bank and Hill.  The Tambussi Letter further acknowledged, pursuant to the Employment Agreement, contractual obligations to (1) pay Hill a separation payment in the amount of $11,250,000; (2) allow Hill to participate in Commerce Bank insurance benefits for a three-year period; (3) effectuate an immediate vesting of Hill's outstanding stock options; and (4) release Hill "from any restrictive covenants on the termination date."  (Def.'s Br. in Support of Partial Summary Judgment on Count Six at Ex. B.)

2

On March 31, 2008, the United States banking subsidiaries of TD and Commerce Bancorp., LLC – TD Banknorth, N.A., Commerce Bank, N.A., and Commerce Bank/North – were merged into TD Banknorth, N.A. and renamed TD Bank, N.A.   TD Bank, N.A., subsequently announced that it would begin branding its retail operations under a new name, "TD Bank, America's Most Convenient Bank" later in 2008.  These re-branding efforts were completed on or before September 27, 2009.

Since his departure from Commerce Bank, Hill has gone into the consulting business.  He has also gained an ownership interest in a new concern known as Metro Bank, which apparently has expanded into the Mid-Atlantic region of the United States and intends to enter the United Kingdom in short order.  In November of 2008, Hill prepared to give a presentation at the BAI Retail Delivery Conference in Orlando, Florida entitled "Back to the Future, The New American Banking System."  In preparation for this presentation, Hill prepared a slide-show (the "First BAI Presentation"), which he submitted to the BAI Conference's organizers, who in turn made this document publicly available on the internet.

The First BAI Presentation contains twenty-six slides, created using a typical bullet-point approach.  Aesthetically, the slides consist of mostly white and yellow lettering with red bullet-points and underlining on a purplish-blue background.[1]  The presentation appears to be roughly organized into four sections: (1) introductory materials; (2) the challenge of creating the next great bank; (3) the challenge of creating fans not customers; and (4) closing materials.

The introductory section (slides one through five) appear to generally malign what Hill

---

[1]  The Court acknowledges that the color scheme of the documents before the Court may have been slightly altered due to inadvertent technological difficulties.

refers to as the "Shadow Banking System" and exalt what Hill refers to as the "Commercial Banking System."[2]

The second section (slides six through twelve) opens with a slide entitled "Building a Brand."  This slide contains a colorful graphic depiction of the equation: "Model Value Differentiating + Culture Unique + Execution Fanatical = Fans, not Customers."  The next slide addresses how to become a growth company in a "no-growth" industry; the answer to that question appears to be building a brand that captures customers' loyalty through customer service.  This section continues to discuss (at slides ten and eleven) "The Commerce Philosophy" and "The Commerce Model," which are apparently predicated on a number of non-mutually exclusive ideas such as (1) "core deposits create value"; (2) "customers will trade lower rates for a better retail experience"; (3) "great business creates fans not customers"; (4) "growth retailers not bankers; (5) "unique deposit driven/retail focus"; (6) "service, not rate, drives growth"; (7) "legendary customer experience"; and (8) "growth is essential to success and value."  The second section also includes a slide containing a bar graph representing customer preferences that demonstrates that customers overwhelmingly prefer convenience to good rates.  Two of the slides in this section contain the red "C" logo on the bottom right-hand corner.

The third section (slides thirteen through twenty-one) address the challenge of creating "Fans, Not Customers."  Slide fourteen displays a chart listing various companies (mostly banks) and their attendant "net promoter score," which apparently is defined as the percentage of existing customers who are loyal to the particular company.  Commerce Bank is highlighted in

---

[2]   The slides define the shadow banking system as: (1) money market funds; (2) commercial paper; (3) unregulated investment banks; and (4) CDO's / SIV's, etc.

red and purports to be the leader of this list at 42 percent.  Slide fifteen represents a JD Power – 2007 Retail Banking Satisfaction Survey.  This slide again lists various banks who over-perform or under-perform the national average and appears to show Commerce as ranking number one. Slides sixteen and seventeen appear to graphically represent Commerce Bank's growth through the years.  Slide eighteen is entitled "Kill a Stupid Rule" and apparently reflects the philosophy that a bank focused on legendary customer service should not perpetuate rules that serve no rational purpose.  Slide nineteen contains a large picture of a Penny Arcade coin counting machine (which itself bears the mark "PENNY ARCADE"), is entitled "FREE Self Service Coin Counting," and indicates that 5.6 million transactions occurred in 2006.  Slides twenty and twenty-one contain more comparison charts that show Commerce Bank outperforming other banks and the industry average.  Slides fourteen through twenty-one all display the red "C" logo at the bottom right-hand corner.

The final section (slides twenty-two through twenty-six) is entitled "Reproduce and Prosper."  The first substantive slide in this section contains a picture of the Mid-Atlantic region of the Eastern Seaboard as well as an insert of Southeast Florida.  This map is littered with little red and white "C" logos indicating existing and future stores.  Slide twenty-four contains a comparative bar graph demonstrating Commerce Bank's upward growth compared to a "traditional bank."  Slide twenty-five shows a hybrid scatter/bar graph showing a positive correlation between deposit volume and stock price over time.  The twenty-sixth and final slide is a bar graph showing the value of a $10,000 investment in 1973 of Commerce Bank stock.

On November 17, 2008, Commerce filed a Complaint against Hill alleging, inter alia trademark and copyright infringement and subsequently moved for a preliminary injunction,

5

enjoining Mr. Hill from using Plaintiffs' intellectual property in connection with the BAI presentation.   On November 18, 2008, the Court granted Plaintiffs' motion for a preliminary injunction, enjoining Mr. Hill from utilizing, publishing, showing, presenting, or distributing in any way slides numbers thirteen, eighteen, twenty, and twenty-three.

In response, Mr. Hill rescinded the First BAI Presentation and replaced it with a new slide-show that he actually presented at the BAI Conference on November 18, 2008.  This revised power-point presentation (the "Second BAI Presentation") retains the same title and basic aesthetic scheme as the First.  After the title slide, the Second BAI Presentation contains a slide entitled "Vernon W. Hill – Commerce Bank Corp. Founder, Chairman, CEO 1973 - 2007."  This slide pictures a large, red "M" superimposed over Hill's image and contains the language "Absolutely 100% Not Affiliated with TD Bank.  We Share NO Views."  Otherwise, the first section did not change.

The content of the second section did not change either; however, Mr. Hill interpolated the title "My Philosophy" for the previously entitled "The Commerce Philosophy" as well as the title "The Growth Model" for the previously entitled "The Commerce Model."  The second section of the Second BAI Presentation also omits the red "C" logos from the bottom right-hand corners of slides eleven and twelve.

The third section of the Second BAI Presentation underwent the most radical revision. Hill deleted all the red "C" logos previously displayed at the bottom right.  Hill also deleted pictures of Commerce Bank signage, a Commerce Bank van, a Commerce Bank pen, and a graphical depiction of the Penny character.  Further, slide nineteen from the First BAI Presentation, which contained a picture of a Penny Arcade, does not appear in the Second BAI

6

Presentation.  The Second BAI Presentation also deleted a Commerce Bank logo from slide twenty.  The third section otherwise retains the charts and graphs of the First BAI Presentation.

The title slide of the fourth section – "Reproduce and Prosper" – is deleted in the Second BAI Presentation.  The map slide is also deleted.  The graphs and charts are retained, but the red "C" logo is deleted from the bottom right-hand corner.  The Second BAI Presentation contains a new final slide containing a large Metro Bank logo – the big, red "M."

On February 1, 2009, Commerce filed an Amended Complaint that sounds in six counts and appears to do little more than expand the scope of the claims asserted in the original Complaint to include the First BAI Presentation, the Second BAI Presentation, the Metro Bank Presentation, and other similar presentations.  Counts one and four allege trademark infringement in violation of 15 U.S.C. § 1114(1) and the common law.  Counts two and three allege unfair competition in violation of 15 U.S.C. § 1125(a) and N.J. Stat. Ann. § 56:4-1.  Finally, count six alleges breach of contract.

On November 24, 2009, Hill moved for partial summary judgment on counts one through five, and in a separate motion, moved for partial summary judgment on count six.  Plaintiff filed opposition briefs on January 19, 2010, as well as affidavits pursuant to Federal Rule of Civil Procedure 56(f).  On February 8, 2010, Hill filed reply briefs.  On March 12, 2010, Hill filed a motion to dismiss for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).  Plaintiffs opposed the motion on April 8, 2010, to which Hill replied on April 15, 2010.  Accordingly, all three motions are now ripe for consideration.

7

## II.     LEGAL STANDARDS

### A.     Motion to Dismiss for Lack of Subject Matter Jurisdiction

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a complaint or portions of a complaint may be dismissed for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  A motion to dismiss for lack of subject matter jurisdiction may be brought at any time and may either (1) "attack the complaint on its face" or (2) "attack the existence of subject matter jurisdiction in fact, quite apart from any pleadings."  Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).  In a facial attack, all allegations in the complaint are considered true.  Id.  In a factual attack, the court does not presume the truth of the allegations and "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  Id.  In such a case, "the court can consider affidavits attached to the moving papers or even require such affidavits to be submitted."  New Hope Books, Inc. v. Farmer, 82 F. Supp. 2d 321, 324 (D.N.J. Jan. 13, 2000) (citing Growth Horizons, Inc. v. Delaware County, Pa., 983 F.2d 1277, 1281 n.4 (3d Cir. 1993)).  Furthermore, the plaintiff has the burden of proving that the court has subject matter jurisdiction.  Mortensen, 549 F.2d at 891.  If a court lacks subject matter jurisdiction, it must dismiss the case without prejudice.  In re Orthopedic "Bone Screw" Prod. Liab. Litig., 132 F.3d 152, 155-56 (3d Cir. 1997).

### B.     Motion for Summary Judgment

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine issue of material fact exists only if the evidence is such that a reasonable jury could find for the non-moving party.

Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 248 (1986).  When the Court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment.  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996).  The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.

Once the moving party satisfies this initial burden, the nonmoving party must "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"  Corliss v. Varner, 247 Fed. Appx. 353, 354 (3d Cir. Sept. 17, 2007) (quoting Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a

genuine issue for trial.  <u>Anderson</u>, 477 U.S. at 249.  Credibility determinations are the province

of the factfinder, not the district court.  <u>BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358,

1363 (3d Cir. 1992).

## III.    DISCUSSION

Although filed last in time, the Court will first address Hill's motion to dismiss as it

challenges the Court's authority to proceed.  Because the Court is presently confident of its

jurisdiction, the Court will then address Hill's two motions for partial summary judgment, which

taken as a whole, request summary judgment on all of Plaintiffs' claims.  Ultimately, the Court

will grant in small part and deny in substantial part Hill's motion for partial summary judgment

with respect to counts one through five and deny his motion for partial summary judgment with

respect to count six in its entirety.

### A.    Hill's Motion to Dismiss

Hill argues that Plaintiffs lack standing because they no longer own any of the trademarks

or copyrights subject to the infringement actions.  Hill has produced documentation of a March

20, 2009 assignment of the relevant trademarks and copyrights from Commerce Bancorp LLC to

Toronto Dominion Bank, the non-party, corporate parent of Plaintiffs.  This assignment also

encompassed the right to sue and recover for past infringements.  Thus, Hill concludes that there

is no Article III case or controversy between himself and Plaintiffs.  Plaintiffs make three

arguments in opposition, namely (1) as a wholly-owned subsidiary of Toronto-Dominion Bank,

they have been granted permissive use of the relevant intellectual property; (2) Plaintiffs were the

owners of the relevant intellectual property at the time the suit was filed; and (3) Plaintiffs did

not assign away the right to pursue the present action.

10

Standing is a threshold jurisdictional requirement, derived from the 'case or controversy' language of Article III of the Constitution." Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 117 (3d Cir. 1997); see Steel Co. v. Citizens for Better Env't, 523 U.S. 83, 102 (1998).  The party invoking federal jurisdiction bears the burden of establishing standing "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); accord FOCUS v. Allegheny County Court of Common Pleas, 75 F.3d 834, 838 (3d Cir. 1996).

The Third Circuit has articulated three requirements for standing under Article III:

(1) the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 484-85 (3d Cir. 1998) (citing Defenders of Wildlife, 504 U.S. at 560-61; accord Soc'y Hill Towers Owners' Ass'n v. Rendell, 210 F.3d 168, 175-76 (3d Cir. 2000).  Standing also encompasses a prudential component whereby courts decline to exercise jurisdiction over litigants attempting to assert the rights of another, claiming generalized grievances more appropriately addressed in the representative branches, or where a litigant's complaint falls without the zone of interests protected by the law invoked.  Allen v. Wright, 468 U.S. 737, 751 (1984).  In other words, the parties must have a "personal stake" in the outcome of the lawsuit.  See Lewis v. Continental

11

Bank Corp., 494 U.S. 472, 478 (1990).  Of course, "this case or controversy requirement subsists through all stages of federal judicial proceedings."  Id. at 477.

Before proceeding to the standing analysis in earnest, it is important to emphasize what is not at issue here.  There is no question that Plaintiffs had standing to sue on November 17, 2008 (the date the Complaint was filed) as Hill does not contest Plaintiffs' ownership of the trademarks and copyrights on the alleged date of infringement, nor does he contest Plaintiffs' continued ownership at and through filing.  The only question here is whether Plaintiffs have subsequently forfeited standing as a consequence of the post-Complaint assignment to non-party Toronto-Dominion Bank.

As Plaintiffs correctly note, Federal Rule of Civil Procedure 25(c) authorizes a plaintiff to continue prosecuting an action even after a transfer of interest.  See Fed. R. Civ. P. 25(c) ("If an interest is transferred, the action may be continued by . . . the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party.").  It is meant to allow an action to continue without interruption when an interest in a suit changes hands.  Gen. Battery Corp. v. Globe-Union, Inc., 100 F.R.D. 258, 261 (D. Del. 1982) (citing Matter of Covington Grain Co., Inc., 638 F.2d 1362, 1364 (5th Cir. 1981)).  This procedural rule, however, does not determine what actions survive a transfer of interest, it only governs "the mechanics of substitution in an action which does survive under applicable substantive law."  Id. (citing Hilbrands v. Far East Trading Co., 509 F.2d 1321, 1323 (9th Cir. 1975); 3B J. Moore & J. Kennedy, Moore's Federal Practice, ¶ 25.04[3] (2d ed. 1982)); see also Fed. R. Civ. P. 82 ("These rules do not extend or limit the jurisdiction of the district courts . . . .").

In certain situations, courts have held that a temporary lapse of standing during the course

of infringement litigation does not necessarily mandate dismissal.  For example, in <u>General Battery Corp.</u>, a plaintiff filed a patent infringement action against a corporate defendant known as Globe-Union Inc. (referred to by the court as Globe I), and Globe I counterclaimed for the same.  100 F.R.D. at 259.  A long discovery period followed, during which time Globe I merged into a company known as Johnson Controls, Inc., which in turn transferred its entire right and interest in the patents to a subsidiary, which in turn changed its name to Globe-Union Inc. (referred to by the court as Globe II).  <u>Id.</u>  Some time later, Globe II transferred its entire right and interests in the patents in suit back to Johnson Controls, Inc., at which point Globe II dissolved.  <u>Id.</u>  Finally, Johnson Controls, Inc. transferred its entire right, title, and interest in the patents in suit, as well as "all claims for damages by reason of past infringement," <u>nunc pro tunc</u> to a company known as Globe-Union Inc. (referred to by the court as Globe III).  <u>Id.</u> at 260.

Globe I filed a motion pursuant to Rule 25(c) to change the name of the defendant to Johnson Controls, Inc. and to add Globe III as a party defendant and counterclaim plaintiff.  <u>Id.</u> at 259.  The plaintiff responded by seeking leave to amend its complaint to add Johnson Controls, Inc. as a named defendant as well as by filing a motion to dismiss for lack of standing.  <u>Id.</u>  The plaintiff's motion to dismiss consisted of a constitutional attack on the application of Rule 25(c) by arguing that the only named defendant had voluntarily stripped itself of a stake in the outcome of the case by virtue of the assignment and that a procedural rule like 25(c) could not work to restore jurisdiction.  <u>Id.</u> at 260.

In what the court described as a "close jurisdictional question," it held that it retained jurisdiction over the action by concluding that "subject matter jurisdiction remained and only the ownership of the chose in action was transferred."  <u>Id.</u> at 260, 262.  The court noted that Rule

25(c) is "a valid procedural rule that is necessary for the efficient functioning of the federal courts." Id. at 262.  The court further noted that Rule 25(a) exists to allow an action to continue where a party dies but the action survives, and that Rule 25(c) should be similarly read to allow the court to continue to preside over a case where the action survives but the interest has been transferred. Id. at 262-63.  Finally, the court was satisfied that the essential standing concerns would be addressed and fully satisfied by granting Globe I's motion to change the name of the original defendant and to join Globe III, "not because Globe III's interests are similar to those of Globe I's but because Globe III's claim is Globe I's claim." Id. at 263.

A similar result obtained in Schreiber Foods, Inc. v. Beatrice Cheese, Inc.,402 F.3d 1198, 1200 (Fed. Cir. 2005).  In that case, a plaintiff patent-owner filed suit for infringement. Id.  In the course of the litigation, the plaintiff assigned the patent, along with all claims and causes of action thereunder, to its subsidiary, who in turn gave the plaintiff a non-exclusive license to the patent. Id.  The plaintiff alerted neither the court nor its adversary of the transfer. Id.  The case proceeded to trial and a jury awarded a twenty-six million dollar judgment. Id. at 1201.  The defendants subsequently moved for judgment as a matter of law. Id.  While the motion was pending, the plaintiff arranged for the patent to be reassigned to it along with all causes of action thereunder. Id.

The district court granted the motion for judgment as a matter of law, finding non-infringement. Id.  The Federal Circuit reversed and ordered reinstatement of the jury verdict in favor of the plaintiff. Id.  Subsequently learning of the patent's original assignment, the defendant moved to vacate the judgment on the basis of an alleged lack of standing. Id.  The district court granted the motion to vacate and dismissed the case for lack of jurisdiction by

14

holding that the plaintiff's "lack of ownership during the litigation deprived [the plaintiff] of standing and rendered the suit moot," despite the reacquisition.  Id. at 1202.

On appeal, the Federal Circuit agreed with the district court that, although the plaintiff had standing at the outset of the suit, once the original assignment was completed, the plaintiff unquestionably "lost standing to sue for infringement and the case became moot."  Id. at 1203. The court disagreed, however, with the district court's ultimate disposition of the Rule 60 motion because "the mootness in [the] case was only temporary" as the plaintiff regained its stake in the litigation through reacquisition of the patent before entry of judgment.  Id.

With these decisions in mind, the Court notes that if Plaintiffs truly did assign the rights to prosecute the instant action to its non-party corporate parent, weighty standing concerns would exist, and the Court would seriously question its authority to proceed.[3]  See Schreiber Foods, Inc., 402 F.3d at 1204 n.6 (expressing grave doubts as to whether a plaintiff, who assigned right to bring patent infringement suit pendente lite, would be entitled to continue as the sole plaintiff under Rule 25(c)); Vianix Delaware LLC v. Nuance Communications, Inc., 09-0067, 2009 WL 1364346, at *2 (D. Del. May 12, 2009) (plaintiff does not have standing to bring copyright

---

[3]  As noted, Plaintiffs also claim standing by virtue of a permissive use agreement with Toronto-Dominion.  A nonexclusive licensee does not have standing to sue for copyright infringement.  See Halicki Films, LLC v. Sanderson Sales and Marketing, 547 F.3d 1213, 1220 (9th Cir. 2008); United States v. Chalupnik, 514 F.3d 748, 753 (8th Cir. 2008); Morgan v. Hawthorne Homes, Inc., No. 04-1809, 2009 WL 1010476, at *18 (W.D. Pa. Apr. 14, 2009) (citing Paul Goldstein, I Copyright: Principles, Law and Practice § 4.4.1.1, at 409 (1989)).  On the other hand, a nonexclusive trademark licensee may have "standing to assert a claim of unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which provides that an action may be brought by 'any person who believes that he or she is likely to be damaged' by acts of unfair competition."  O.O.C. Apparel, Inc. v. Ross Stores, Inc., No. 04-6409, 2007 WL 869551, at *3 (D.N.J. Mar. 20, 2007) (citing Susan Progoff, Trademark Licensing, 879 PLI/Pat 41, 61-62 (2006)).

infringement action where plaintiff does not own or retain a beneficial interest in the copyrights). In such a situation, the Court's concerns regarding standing would be amplified by the fact that Plaintiffs have not subsequently reacquired any rights to the relevant intellectual property and no party here has moved to substitute a real party-in-interest.  See General Battery Corp., 100 F.R.D. at 263 (the district courts' standing concerns are ameliorated by the possibility of substituting the present owner).  The Court thus turns to the question of whether Plaintiffs transferred to Toronto-Dominion Bank the right to prosecute the instant action.

There can be no doubt that Commerce transferred the relevant intellectual property to Toronto-Dominion Bank.  Nor can there be any doubt that Commerce transferred the rights to bring, at least some, infringement actions thereunder.  It is less clear whether Commerce transferred to Toronto-Dominion the right to prosecute this particular infringement action against Hill.  Through the trademark assignment documentation, Commerce purported to assign "all its right, title, and interest in and to the Trademarks, together with the goodwill of the business associated with the Trademarks, and the right to sue and recover for past infringements, dilution, and other violations."  (Def.'s Br. in Support of Mot. to Dismiss, Ex. 1. at DEF001018.)  Hill contends that this assignment "encompasses all of the trademark and copyright infringement claims that [P]laintffs currently assert against Mr Hill."  (Id. at 4.)  This is certainly a plausible reading of the assignment as the instant litigation clearly alleges "past infringement."

On the present record, however, the Court disagrees with this reading of the assignment. As a general rule, an assignment of a patent does not ordinarily include the right to sue for past infringement.  See Recursion Software, Inc. v. Interactive Intelligence, Inc., 425 F. Supp. 2d 756, 775 (N.D. Tex. 2006) (citing Prather v. Neva Paperbacks, Inc., 410 F.2d 698, 700 (5th Cir.

16

1969); ABKCO Music, Inc. v. Harrisongs Music, Ltd., 944 F.2d 971, 980 (2d Cir. 1991);

Seastrunk v. Darwell Integrated Tech., Inc., No. 3:05-0531, 2005 WL 1667811, at *3-4 (N.D.

Tex. July 15, 2005)); see also Schreiber Foods, Inc., 402 F.3d at 1202 (citing Moore v. Marsh, 74

U.S. (7 Wall.) 515, 522 (1869)) (observing the general rule that an assignment of a patent does

not ordinarily include the right to sue for past infringement).  Mindful of that concept, and with

an eye towards discerning meaning from grammar, the assignment appears to assign two things:

(1) "all [of Commerce's] right, title, and interest in and to the Trademarks, together with the

goodwill of the business," and (2) "the right to sue and recover for past infringements, dilution,

and other violations."  The Court notes that although Commerce appears to have assigned "all"

its rights, title, and interest in and to the trademarks, the word "all" is conspicuously absent from

the language assigning the right to sue and recover for past infringements.

       The Court further observes that this assignment was effectuated on March 20, 2009,

which is over four full months after Commerce had already exercised its right to bring the instant

suit.  Therefore, it occurs to the Court that the right to "sue and recover" for the infringements at

issue here had already been exercised and therefore could not, and was not, assigned to Toronto-

Dominion.  Moreover, the Court finds salient the lack of any reference whatsoever in the

assignment documentation to the right to maintain the present suit, which given the timing and

nature of the present suit, must surely have been on Plaintiffs' collective radar screens.

Accordingly, at least for present purposes, the Court cannot conclude that Commerce assigned to

Toronto-Dominion the right to maintain the present trademark infringement action.

       The language of the copyright assignments presents a slightly more difficult question of

interpretation.  Through the copyright assignment documentation, Commerce purported to assign

17

to Toronto-Dominion Bank "nunc pro tunc as of March 20, 2009 all right, title, and interest, including copyright rights in and to the Works, including the right to sue and recover for past and future infringements, and other violations." (Def.'s Br. in Support of Mot. to Dismiss, Ex. 2. at DEF000973.) On its face, this language appears to identify "the right to sue and recover for past and future infringements" – not as a separate category of assigned rights – but as an example of the sort of rights included in the assignment of "all right, title, and interest, including copyright rights in and to the Works to Toronto-Dominion." (Id.) (emphasis added). Nonetheless, in light of the fact that Commerce had already brought suit on the instant infringements at the time of this document's execution, the Court does not read "the right to sue and recover for past and future infringements" as establishing that Commerce assigned the right to maintain the present copyright infringement claim. Without being convinced that Plaintiffs no longer possess the right to maintain their claims for trademark and copyright infringement, the Court cannot conclude that Plaintiffs lack standing.[4]

The cases cited by Hill in support of dismissal do not dictate a contrary result. These cases appear to stand for the proposition that a plaintiff who lacks title to intellectual property at the time the suit was filed does not have standing to bring infringement claims thereunder. See Gaia Tech. Inc. v. Reconversion Tech., Inc., 93 F.3d 774, 778 (Fed. Cir. 1996) (plaintiff with "inability to prove that it was the owner of the Intellectual Property at the time the suit was filed" lacked standing), amended on rehearing by, 104 F.3d 1296 (Fed. Cir. 1996); Insect Science Resource, LLC v. Timberline Fisheries Corp., No. 07-2662, 2010 WL 431233, at *4 (N.D. Ga.

---

[4] Should further evidence come to light tending to prove that Plaintiffs no longer own the relevant trademarks and copyrights, the Court would, on a proper motion, reconsider the factual basis of its jurisdiction as well as consider any motion to substitute under Rule 25(c).

Feb. 4, 2010) (plaintiff who did not own trademark at time of filing or time of alleged

infringement lacks standing); Visa U.S.A. Inc. v. First Data Corp., No. 02-1786, 2005 WL

6271242, at * 4 (plaintiff who owned non-exclusive trademark licensee does not have standing to

sue for infringement).  As noted, it is not contested that Plaintiffs here owned the relevant

trademarks and copyrights at the alleged time of infringement and at the time Plaintiff brought

the action against Hill.[5]  Accordingly, the Court will deny Hill's motion to dismiss.

### B.      Motion for Partial Summary Judgment on Counts One Through Five

### 1.      Trademark Infringement[6]

According to the Amended Complaint, the allegedly infringed trademarks are (1)

"COMMERCE"; (2) "COMMERCE BANK"; (3) "PENNY"; (4) "PENNY ARCADE"; and (5)

the red "C" logo (collectively, the "Marks").  The Marks were allegedly infringed by way of: (1)

the First BAI Presentation; (2) the Second BAI Presentation; (3) the Metro Bank Presentation;

and (4) other similar presentations.[7]  Hill argues that the trademark infringement claims should

---

[5]  As a consequence, Plaintiff's February 12, 2010 letter to the Court, acknowledging Toronto-Dominion Bank's voluntary surrender for cancellation of the "COMMERCE" trademark, does not prove Plaintiffs' lack of standing.

[6]  As Hill notes, the marks at issue in this case may be better characterized as "service marks."  See 15 U.S.C. § 1127 (term "service mark" refers to "any word, name, symbol, or device . . . used by a person . . . to identify and distinguish the services of one person . . from the services of others and to indicate the source of the services . . . .").  The parties, however, generally refer to the Marks as trademarks, and thus, for the purposes of this Opinion, the Court will adopt the custom.

[7]  These last two categories of presentations refer to presentations Plaintiffs believe Hill has given to promote his new banking venture, Metro Bank.  Hill's various motions do not address either the Metro Bank Presentation or any other similar presentations.  In fact, Hill has conducted his motions' practice as if the Metro Bank Presentation and the other similar presentations did not form a partial basis for the allegations in the Amended Complaint.  As Magistrate Judge Williams made clear to Hill in December of 2009, and reiterated by way of a

be dismissed because (1) Plaintiffs have abandoned the "COMMERCE," "COMMERCE BANK," and the red "C" marks (collectively, the "Commerce Marks"); and (2) Hill's use of all Marks is protected by the doctrine of nominative fair use.  By way of contrast, Plaintiffs insist that they have not abandoned the Marks and that Hill's use was not fair.

### i.    Abandonment

Hill argues that Plaintiffs have abandoned the Commerce Marks because (1) Commerce Bank changed its name to "TD Bank, Americas Most Convenient Bank"; (2) Plaintiffs invested millions of dollars in a re-branding campaign for the newly-merged company and its various branch locations; (3) Plaintiffs no longer own the Commerce Bank domain name; (4) the federal registration of the "COMMERCE" mark was voluntarily surrendered for cancellation;[8] (5) Plaintiffs abandoned applications filed in the United States Patent and Trademark Office ("USPTO") to register the "COMMERCE" mark; and (6) Plaintiffs voluntarily withdrew oppositions filed with USPTO against companies using other "COMMERCE" marks.  In opposition, Plaintiffs argue that the Commerce Marks have not been abandoned because (1) they do not necessarily intend not to resume using the Commerce Marks; (2) insufficient time has passed since the re-branding to establish abandonment; (3) Plaintiffs still actually use the Marks; and (4) the allegedly infringed Marks are but members of a larger family of trademarks of which many marks are still in use.[9]

---

Text Order on June 11, 2010, this is simply not the case.

[8]  Technically, Toronto-Dominion, not Plaintiffs, voluntarily surrendered this mark on December 28, 2009.

[9]  Plaintiffs also argue that the "PENNY ARCADE" and "PENNY" marks are still in use. Hill does not contend that these marks have been abandoned.  Therefore, the Court's

The defense of abandonment is available in a trademark infringement case where the trademark owner has (1) ceased to use the mark; and (2) intends not to resume use of the mark. 15 U.S.C. § 1127; U.S. Jaycees v. Philadelphia Jaycees, 639 F.2d 134, 138 (3d Cir. 1981); Zinn v. Seruga, No. 05-3572, 2008 WL 482324, at *3 (D.N.J. Feb. 19, 2008) (mem.). See generally Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 17.11 (4th ed. 1997). A rebuttable presumption of abandonment is raised where the non-use has persisted for three years or longer. 15 U.S.C. § 1127. Otherwise, "[i]ntent not to resume may be inferred from circumstances." Id. Abandonment is a defense to trademark infringement because the public no longer associates the mark with the previous owner's products or services. See Adv. Ceramics Corp. v. Saint-Gobain Adv. Ceramics Corp., No. 01-7864, 2005 WL 323739, at *2 (S.D.N.Y. Feb. 10, 2005) (mem.) (citing Defiance Button Mach. Co. v. C. & C. Metal Prod. Corp., 759 F.2d 1053, 1059 (2d Cir. 1985)). Abandonment must be strictly proved because it is in the way of a forfeiture. U.S. Jaycees, 639 F.2d at 139 (citation omitted); see Zinn, 2008 WL 482324, at *4 ("[E]vidence of abandonment must be clear and convincing.") (citing Am. Olean Tile Co. v. Am. Marazzi Tile, Inc., No. 86-3089, 1988 WL 29056 (E.D. Pa. Oct. 5, 1988); Interstate Net Bank v. NETB@NK, Inc., 348 F. Supp. 2d 340, 348 (D.N.J. 2004)).

Hill makes a compelling case that Plaintiffs have ceased using the Commerce Marks. Apparently, immediately post-merger, Plaintiffs intended to assume the name "TD Commerce Bank," but were prevented from doing so in several Massachusetts counties (at least on a temporary basis) by way of a preliminary injunction entered by a federal district court. Rather than "spend countless time as well as valuable resources" challenging the issue in court,

_____

abandonment analysis will focus exclusively on the Commerce Marks.

Plaintiffs decided to "move forward" under the new brand name of "TD Bank, America's Most Convenient Bank."  (Def.'s Br. in Support of Mot. for Partial Summary Judgment on Counts 1-5 at Ex. 1.)  This name change was announced to the public in a July 23, 2008 TD Banknorth press-release.  (Id.)  In fact, Plaintiffs' intent to change names appears to be well documented in the public record.  For example, a Reuters article published on October 31, 2008 observed:

> The Commerce Bank name will disappear from hundreds of branches along the Atlantic seaboard by Nov. 5, replaced by TD Bank to reflect its new owner, Toronto-Dominion Bank . . . .

(Id. at Ex. 3.)

The extensive re-branding campaign conducted by Plaintiffs in the aftermath of the decision to move away from the a hybrid TD-Commerce name also indicates that they have ceased using the Commerce Marks to identify their banking services.  Plaintiffs themselves have well publicized the re-branding efforts, describing them in one press-release as follows:

> Starting November 1, Commerce Bank and TD Banknorth Stores in the Mid-Atlantic, Metro Washington, DC and Florida markets will be branded TD Bank, America's Most Convenient Bank.
> . . . .
> TD Bank reflects a new name for the combined company, but the brand positioning as "America's Most Convenient Bank,' with its legendary focus on convenience and service, remains unchanged.
> . . .
> Interior and exterior signage at Commerce and TD Banknorth stores in the Mid-Atlantic, Metro Washington, DC, and Florida markets will change to TD Bank between November 1 and November 3.  Customers of Commerce Bank and TD Banknorth stores in the Mid-Atlantic, Metro Washington, DC, and Florida markets will be able to bank at any of the more than 575 rebranded TD Bank stores.

(Id. at Ex. 4.)  Accordingly, the Court would be hard-pressed to find that Plaintiffs continued to use the Commerce Marks at the time of alleged infringement.

22

Plaintiffs' argument that the Commerce Marks are still in use is unavailing.  According to

Plaintiffs, "[t]here is internal use by TD Bank employees of the Commerce trademarks.  The "C"

logo and the Commerce trademarks are still used and can be seen throughout its operating

systems."  (Affidavit of Allegra ¶ 7.)  Moreover, according to Plaintiffs, the red "C" logo is still

visible in "some structural aspects of the stores."  (Id. ¶ 8.)  Even if that is so, in the abandonment

context, "use" of a mark takes on a specialized meaning.  It means "the bona fide use of such

mark made in the ordinary course of trade, and not made merely to reserve a right in a mark."  15

U.S.C. § 1127.  In other words, "use" means that use which "maintain[s] 'the public's

identification of the mark with the proprietor.'"   See Pilates, Inc. v. Current Concepts, Inc., 120

F. Supp. 2d 286, 309 (S.D.N.Y. 2000) (quoting Silverman v. CBS, Inc., 870 F.2d 40, 48 (2d Cir.

1989)).  Thus, purely internal or de minimis use will not preclude abandonment.  See id. (citing

Stetson v. Howard D. Wolf & Assoc's, 955 F.2d 847, 851 (2d Cir. 1992)).  As a consequence,

the Court is not satisfied that the internal usage and residual structural aspects vaguely identified

by Plaintiffs qualify as the continued "use" required for purposes of avoiding abandonment.[10]

The harder question in this case is whether Plaintiffs had formed an intent not to resume

use of the Commerce Marks at the time Hill allegedly infringed them.  To be sure, intent not to

resume use of the Commerce Marks could be inferred from Plaintiffs' affirmative decision to

"move forward" with the name "TD Bank, America's Most Convenient Bank" (and thus away

from the proposed name of "Commerce TD Bank").  See Thomas McCarthy, McCarthy on

---

[10]  Plaintiffs' citation to Marshak v. Treadwell, 58 F. Supp. 2d 551 (D.N.J. 1999) is also
unavailing.  In that case, the district court held that a musical group named "The Drifters" did not
abandon its trademark in the name simply because the group had disbanded where the group
continued to use the mark in the sale of original Drifters records.  Id. at 575.  Here, Plaintiffs no
longer provide banking services to the public under the Commerce name.

Trademarks and Unfair Competition, § 17:11 ("An intent not to resume use might be explicitly stated in advertising, as where a company advertises that 'We are Changing Our Name from ALPHA to ZETA.  Don't Call Us ALPHA anymore.'").  This inference could be made more compelling by the recognition that Plaintiffs apparently spent no small sum of money to effectuate the brand conversion.  Moreover, such an intent could also potentially be supported by Plaintiffs' subsequent actions before the USPTO as well as by the fact that Plaintiffs no longer own the domain name www.commerceonline.com.

That said, the Court is not satisfied that Hill has demonstrated intent not to resume use as a matter of law by clear and convincing evidence.  In this case, the short period of time that passed between alleged abandonment and alleged infringement weighs heavily against summary judgment.  Hill's alleged infringement through the BAI Presentations came less than four month after Plaintiffs' press-release announcing its name change.  Moreover, it is not clear whether re-branding was complete at the time of the BAI Presentations,[11] and if it was not, what level of completion such re-branding had achieved in the eyes of the consuming public.  Of course, the Court does not know when all of the other presentations that round-out the subject of this lawsuit were allegedly made by Hill, and this uncertainty also counsels against finding abandonment as a matter of law.

Moreover, although Plaintiffs' voluntary cancellation of the "COMMERCE" mark might in different circumstances indicate an intent not to resume use, this particular surrender did not

---

[11]  Hill suggests that re-branding was completed on November 5, 2008 pursuant to Plaintiffs' intentions announced in the October 31, 2008 press-release.  On the other hand, Plaintiffs allege that re-branding was not actually complete until September 27, 2009.  (Affidavit of Allegra ¶ 4.)

occur until well after the alleged BAI infringements.  Thus, it remains an open question whether Plaintiffs intended to abandon the "COMMERCE" mark at the time of the alleged infringement and whether Plaintiffs intended to abandon the other Commerce Marks at all.  Plaintiffs suggest that they have not yet decided whether to reuse the non-surrendered Commerce Marks as part of future marketing schemes.  Given the short period of time that passed between re-branding and alleged infringement, this lack of certainty (if true) is understandable, and consequently it would be a mistake for this Court to interpret such indecision as clear and convincing evidence that Plaintiffs have no intent to resume use of the Commerce Marks and are instead attempting to hoard them for the sole purpose of excluding Hill.  Although Hill is correct that some courts have found abandonment on summary judgment, see, e.g., Emer. One, Inc. v. Amer. Fire Eagle, No. 96-831, 1998 WL 937274, at *7 (E.D.N.C. Nov. 17, 1998) (memorandum and recommendation) (court finds abandonment where plaintiff ceases manufacturing branded fire trucks for period of years), the particular facts of this case make such a finding improvident at this time.

### ii.     Nominative Fair Use

Separate and apart from Hill's argument that the Commerce Marks have been legally abandoned, is his argument that his use of all of the Marks was protected under the doctrine of nominative fair use.  Hill invokes the protection of that doctrine because (1) he used the Marks in an autobiographical manner to describe his own history as Founder and President of Commerce Bank and in a teaching capacity; (2) the substantive content of the BAI Presentations essentially mirrored information already in the public domain by virtue of a 2006 Harvard Business School study; (3) he disclaimed any present relationship with TD Bank at the outset of the Second BAI Presentation; and (4) no banker in the room could seriously have misinterpreted the relationship

between Hill and Plaintiffs.  Conversely, Plaintiffs argue that (1) Hill could have discussed the topic of the effect of the retail industry on the banking industry and his experiences with Commerce Bank without utilizing Plaintiffs' Marks; (2) Hill's use of the Marks was excessive; (3) the First BAI Presentation misrepresented the relationship between Hill and Plaintiffs and contained no disclaimer; (4) Hill's verbal remarks expressed as part of the Second BAI Presentation referred to Hill and Commerce Bank as "we," leading to the inference that Hill was still affiliated with Plaintiffs and the Marks; and (5) it is unknown whether Hill's alleged use of the Marks in undisclosed presentations was fair because these presentations have not yet been produced.  As discussed more fully below, the Court cannot on the record before it determine that Hill's use of the Marks was fair as a matter of law.

Generally speaking, to prevail on a trademark infringement claim, a plaintiff must show that (1) the marks are valid and legally protectable; (2) plaintiff owns the marks; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services.  Opticians Ass'n of Am. v. Independent Opticians of Am., 920 F.2d 187, 192 (3d Cir. 1990).  In the Third Circuit, nominative fair use operates as an affirmative defense.[12]  See Century 21 Real Estate Corp. v. Lendingtree, Inc., 425 F.3d 211, 222 (3d Cir. 2005).  It applies where the alleged infringer uses the trademark holder's product to describe the trademark holder's product, even if the alleged infringer's ultimate goal is to describe his own product.  Id. at 214 (citing KP Permanent Make-Up, Inc. v. Lasting Impression

---

[12]   Nominative faire use can be distinguished from "classic" fair use, which "occurs where the defendant uses the plaintiff's mark to describe the defendant's own product."  Century 21 Real Estate Corp. v. Lendingtree, Inc., 425 F.3d 211, 214 (3d Cir. 2005) (New Kids on the Block v. New Am. Pub., Inc., 971 F.2d 302, 308 (9th Cir. 1992)).

I, Inc., 328 F.3d 1061, 1072 (9th Cir. 2003)); David's Bridal, Inc. v. House of Brides, Inc., No. 06-5660, 2010 WL 323306, at *4 (D.N.J. Jan. 20, 2010)).  "Nominative fair use also occurs if the only practical way to refer to something is to use the trademarked term."  Century 21 Real Estate Corp., 425 F.3d at 214 (citing KP Permanent Make-Up, Inc., 328 F.3d at 1072).

Nominative fair use cases are governed by a two-step approach.  Id.  at 222.  First, the plaintiff must prove that defendant's use of the plaintiff's mark is likely to cause confusion.  Id. Then, the defendant must show that his nominative use of plaintiff's mark was nonetheless "fair" by showing "(1) that the use of plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service; (2) that the defendant uses only so much of the plaintiff's mark as is necessary to describe plaintiff's product; and (3) that the defendant's conduct or language reflect the true and accurate relationship between plaintiff and defendant's products or services."  Id.  In other words, under the Century 21 approach, the use can be a little confusing provided it is fair on the whole.  See id. at 217.  Hill questions whether Plaintiffs can satisfy their burden of demonstrating a likelihood of confusion, but mounts his summary judgment attack on the argument that his use was fair regardless.  Consequently, the Court must ask whether Hill's use of the Marks was fair as a matter of law.

To answer the questions of whether Hill's use of Plaintiffs' Marks was necessary to describe the relevant services and whether Hill used only so much of the Marks as was necessary to describe Plaintiffs' services, the Court must first ask what Hill was attempting to accomplish through the various presentations at issue in this suit.  Hill attempts to characterize the BAI Presentations as purely pedagogical exercises designed to relay his factual experience at the helm of Commerce Bank to a group of interested banking insiders as well as give these persons advice

about how to chart the courses of their own banking concerns going forward. This characterization is consistent with the general subject-matter of the slides and some of Hill's verbal remarks. Conversely, Plaintiffs believe that the BAI Presentations represent a thinly disguised marketing stunt designed to promote Hill's new Metro Bank venture by drafting off the goodwill associated with Plaintiffs' intellectual property. Moreover, Plaintiffs suspect that the other presentations subject to this lawsuit would also demonstrate Hill's free-riding intent, if only Hill would produce them. Given the record, this characterization also seems plausible.

As a general matter, the Court is comfortable with the idea that it was reasonably necessary for Hill to use the Commerce Bank name in an autobiographical presentation. After all, Plaintiffs cannot deny that Hill founded Commerce Bank and grew the company to monstrous proportions during a roughly thirty-year leadership period. The Court is also comfortable with the notion that it was reasonably necessary for Hill to discuss the retail banking principles he has developed over the years and that it was reasonably necessary for him to reference the fact that he installed these principles at Commerce Bank with no small level of success.[13] In the context of a presentation designed to tell the story of Vernon Hill and/or impart acquired banking wisdom to fellow bankers, references to Plaintiffs' marks such as "COMMERCE" and "COMMERCE BANK" by Hill can hardly be said to be unnecessary.

For purposes of Hill's instant summary judgment motion, however, the problem is that the First BAI Presentation arguably exceeded this scope. The First BAI Presentation used the red "C" logo rather cavalierly and without any clear historical or pedagogical purpose. For example,

---

[13] The Court takes no position at this juncture on whether Hill's Employment Agreement precluded him from divulging this information.

twelve of the twenty-six slides in the First BAI Presentation presented the red "C" logo on the bottom right-hand corner.  Neither the slides taken as a whole nor the transcript of Hill's verbal remarks explains this usage.  Other slides used other Marks in ways that are arguably not necessary for purely pedagogical or autobiographical purposes.  Slides eighteen and twenty display graphics of the Commerce Bank logo and slide nineteen displays a large graphic of the Penny Arcade, which itself bears the "PENNY ARCADE" mark.  Still other slides are captioned "Commerce Model" and "Commerce Philosophy."  Although it may have been necessary for Hill to use some of these Marks to describe his time at Commerce Bank and his continued position on what it takes to succeed in the banking industry, the Court simply cannot hold as a matter of law that it was necessary to use them all with such frequency.

In addition, the Court has no way of determining whether Hill may have used any of the Marks unnecessarily in any of the other allegedly infringing presentations because all of these documents have not been produced.[14]  As a consequence, it is by no means clear that the nominative fair use defense protects Hill from Plaintiffs' trademark claims predicated on alleged infringement during the First BAI Presentation, the Metro Bank Presentation, or any other as-of-yet unidentified presentation that forms the basis of this action.  Thus, summary judgement with respect to Plaintiffs' trademark claims predicated upon these presentations shall be denied.

The Second BAI Presentation is a different story.  As noted, after the Court preliminarily enjoined Hill from infringing upon Plaintiffs' marks, he modified his slides.  For example, Hill removed the red "C" log from the bottom right-hand corner of the offending slides.  He also

---

[14]  The Metro Bank Presentation has been produced by Plaintiffs as an exhibit to their brief in opposition.  Hill's arguments in support of summary judgment, however, do not address this presentation.

removed the Commerce Bank logos and the Penny Arcade graphics.  He re-captioned the "Commerce Model" slide as "The Growth Model" and the "Commerce's Philosophy" slide as "My Philosophy."  In fact, the only instances where the Commerce name is used is in slides presenting what appears to be historical data depicting Commerce Bank's rankings according to several JD Power studies as well as charts depicting Commerce Bank's growth over time.

The transcript of the verbal remarks given by Hill at the actual BAI event confirms that Hill only used the words "COMMERCE", "COMMERCE BANK," and "PENNY ARCADE" in a historical sense to describe the services that Commerce Bank provided under his tenure as well as to describe an overall retail banking strategy that he helped develop and to which he continues to adhere.  A review of the transcript reveals that Hill carefully invoked Commerce Bank's trademark name only to describe the things Commerce Bank did under Hill's leadership.  As Plaintiffs observe, Hill frequently used the pronoun "we," but in most instances he did so to refer to actions taken by himself and Commerce Bank when "we" properly described the relationship between the two.  Moreover, Hill also used the word "we" to refer to the retail banking philosophy that both he and Plaintiffs (presumably) share.  At one point, Hill arguably began to refer incorrectly to his present relationship with Commerce as "we," but he quickly corrected himself by stating "I can't say we."  (Def.'s Br. in Support of Mot. for Partial Summary Judgment on Counts 1-5, Ex. 7 at 6.)

In other words, Hill did not use language that would misrepresent the relationship between himself and Plaintiffs.  His remarks made clear that he was no longer affiliated with Commerce Bank and played no role in TD Bank.  He mentioned this at the outset in concert with his disclaimer slide, and repeated it later in the presentation.  To be sure, Hill spoke ad nauseam

about his success at Commerce Bank as well as his current retail banking philosophy, and in so doing invoked the trademarked name "COMMERCE" and "COMMERCE BANK." This use, however, is materially different from a glass cleaning company's use of a Porsche automobile in its advertisement. See Liquid Glass Ents., Inc. v. Dr. ING h.c.f. Porsche AG and Porsche Cars N.A., Inc., 8 F. Supp. 2d 398, 402 (D.N.J. 1998). In that latter case, the glass cleaning company was clearly leaching off Porsche's good-will; whereas, in Hill's case, Commerce Bank's history of success and its retail banking philosophy is rather inseparable from Hill's personal history of success and his own personal retail banking philosophy. Thus, the Court is satisfied that Hill's limited use of the Marks in the Second BAI Presentation was fair and protected. Accordingly, the Court will grant Hill's motion for summary judgment on Plaintiffs' trademark claims only in so far as they are predicated upon the Second BAI Presentation.

### 2.    Copyright Infringement

Count Five of the Amended Complaint alleges copyright infringement in violation of 17 U.S.C. § 101, et seq. The materials allegedly subject to copyright protection in this case are voluminous, consisting of over five hundred pages of documents attached to the Amended Complaint as Exhibits B-1 through B-5. These documents include (1) Commerce Bank's 2005 Annual Report; (2) Commerce Bank's 2006 Annual Report; (3) a graphic depiction of the Penny character; (4) a slide-show designed for use at Commerce University; and (5) a Commerce Bank Officer Orientation Presentation. Plaintiffs allege that Hill reproduced (perhaps with slight deviations in some instances) many of the slides, charts, diagrams, maps, images, and other graphics contained in these copyrighted documents in both of the BAI Presentations as well as in the other presentations that round-out the subject matter of this suit.

To prove copyright infringement, a plaintiff must show (1) ownership of a valid copyright in the work allegedly infringed; and (2) that the defendant copied protected elements. <u>Ford Motor Co. v. Summit Motor Prods., Inc.</u>, 930 F.2d 277, 294 (3d Cir. 1991) (citing <u>Whelan Assocs. v. Jaslow Dental Laboratory</u>, 797 F.2d 1222, 1231 (3d Cir. 1986)); <u>Virgin Records Am., Inc. v. Bagan</u>, No. 08-4694, 2009 WL 2170153, at *3 (D.N.J. July 21, 2009). Fair use of copyrighted materials "for purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research," however, does not amount to infringement. 17 U.S.C. § 107. To determine whether a particular use was fair, a court should consider:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work."

<u>Id.</u>

As a threshold matter, it appears that the Second BAI Presentation did not completely remedy the copyright infringements presently alleged. As noted, the Court enjoined Hill from using slides thirteen, eighteen, twenty, and twenty-three of the First BAI Presentation, which included graphic images of, <u>inter alia</u>, the Penny character and a map of the mid-Atlantic region depicting existing and forthcoming Commerce Bank retail branch locations. Although Hill deleted those slides from the Second BAI Presentation, Plaintiffs now indicate that other slides

contained materials in which Plaintiffs assert a copyright.[15]  Accordingly, the Court turns to the question of whether either of the BAI Presentations constituted fair use as a matter of law.

The purpose and character of Hill's use do not dictate such a finding.  Although Hill strenuously disagrees, a fair argument can be made that the BAI Presentations were given – not for pedagogical purposes – but rather to promote Hill's new banking venture.  Use of copyrighted materials for commercial purposes cuts against a finding of fair use.  See Video Pipeline, Inc. v. Buena Vista Home Ent., Inc., 275 F. Supp. 2d 543, 561 (D.N.J. 2003) (citing Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569 (1994)).  Moreover, because it appears that Hill simply cribbed charts and graphs from Plaintiffs' internal documents (with alterations in some circumstances) it is not clear to the Court that Hill's use of the materials added much of a further purpose or different character to the documents.  Non-transformative use of copyrighted materials further cuts against a finding of fair use.  See A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1015 (9th Cir. 2001) ("Courts have been reluctant to find fair use when an original work is merely retransmitted in a different medium.").

The nature of the use cuts both ways.  Amongst the allegedly infringing material included in the First BAI Presentation were graphical representations of the Penny character.  Creative works are "'closer to the core of intended copyright protection than more fact-based works.'" A&M Records, Inc., 239 F.3d at 1016 (citing Campbell, 510 U.S. at 586); see Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 563 (1985) ("The law generally recognizes a greater need to disseminate factual works than works of fantasy or fiction.").  Thus, use of these

_____

[15]  Plaintiffs explicitly noted at the preliminary injunction hearing that they believed Hill had infringed copyrighted materials beyond that contained on slides thirteen, eighteen, twenty, and twenty-three.

creative materials cuts further against a finding of fair use.  On the other hand, the various charts

and graphs allegedly lifted from Plaintiffs' internal documents are less creative and thus create

less of an impediment to such a finding.

The substantiality of Hill's use is indeterminate on the present record.  From a

quantitative perspective, Hill appears to have used only a small percentage of the various reports

and slide-shows that constitute the copyrighted materials.  However, this inquiry requires

consideration, not just of quantity of material used, but also of "their quality and importance."

Video Pipeline, Inc., 275 F. Supp. 2d at 563 (citing Campbell, 510 U.S. at 586).  Hill does not

link slides in the BAI Presentations with specific pages of copyrighted documents and explain

why these pages should be viewed as insubstantial parts of the whole.  Finally, because the BAI

Presentations are arguably commercial in nature, the Court cannot find that Hill's use posed no

threat of market harm.  See id. at 565 (quoting A&M Records, 239 F.3d at 1016 ("If the intended

use is for commercial gain, . . . likelihood [of market harm] may be presumed.")).

In sum, the Court simply cannot find that the BAI Presentations are protected by the

doctrine of fair use as a matter of law.  Both BAI Presentations include matter in which Plaintiffs

claim a copyright.  If, on the one hand, Hill's version of the BAI Conference is believed, the fact-

finder may well determine that he used the copyrighted material fairly.  On the other hand, if

Plaintiffs' version of the BAI Conference is believed, the fact-finder may well come to the

opposite result.  Of course, the Court cannot say one way or the other what a fact-finder could

conclude about Hill's alleged use of copyrighted material in the Metro Bank Presentation and

other similar presentations because Hill refuses to admit these presentations are in play.

Accordingly, the entry of summary judgment on Plaintiffs' copyright claims would be

inappropriate at this time.

**C.     Motion for Partial Summary Judgment on Count Six**

Plaintiffs claim that Hill violated the terms of his Employment Agreement by disclosing

non-public company information after his discharge and/or by engaging in acts harmful or

inimical to the company's interests.  The Employment Agreement provides, in pertinent part:

**15.     Confidential Information and Non-Competition**

**15.1     Confidentiality**

(a) ***Company Information Definition*.  "Company Information"**
means all data relating to Commerce's business that is not generally published or
available to the public, including writings, equipment, processes, drawings,
strategic plans, reports, manuals, inventions, records, financial information,
business plans, customer lists, the identity of and other facts concerning
prospective customers, inventory lists arrangements with suppliers and customers,
computer programs, or other materials embodying trade secrets, customer product
information, or technical or business information of Commerce.

(b) ***Non-Disclosure and Non-Use*.**  During the Term, or any later
time, except with the prior written consent of Commerce's Board, Hill shall not,
directly or indirectly:
(i) *Non-Disclosure.*  Disclose, communicate or divulge
Company Information to any Person other than authorized Commerce personnel.

(ii) *Non-Use.*  Use Company Information for the benefit of
himself or any other Person, other than authorized Commerce personnel.

**15.2     Commerce's Interests.**  Hill will not, during the Term, except
with the express prior written consent of Commerce's Board, directly or
indirectly, in any capacity (including but not limited to employee, owner, partner,
consultant, agent, director, officer, shareholder or in any other capacity) engage in
or assist any Person to engage in any act or action which he, acting reasonably,
believes or should believe would be harmful or inimical to the interests of
Commerce.

(Def.'s Mot. for Partial Summary Judgment on Count Six at Ex. A.)  Hill argues that he has not

violated the Employment Agreement because (1) he was released from all obligations contained

35

in Paragraphs 15.1 and 15.2 pursuant to his termination without cause; (2) none of the

information Hill disclosed was "company information"; and (3) the obligations contained in

Paragraph 15.2 expired upon Hill's termination.  The Court does not believe that summary

judgment is appropriate on the record and will address each argument in turn.

### 1.      Release

Hill argues that he is no longer bound by Paragraphs 15.1 and 15.2 of the Employment

Agreement because Plaintiffs have waived these obligations through the Tambussi Letter.  As

noted, this letter acknowledged a number of contractual obligations owed to Hill by virtue of his

termination without cause, including a "[r]elease from any restrictive covenants on the

termination date."  (Id. at Ex. B.)  According to Hill, paragraphs 15.1 and 15.2 constitute

"restrictive covenants," and therefore no longer restrained Hill's actions at the time of the

Presentations.  Plaintiffs argue that the Tambussi Letter only released Hill from paragraph 15.3

(captioned "Non-Competition and Time of Restrictions") because this is the only paragraph of

the Employment Agreement that, in their view, contained a "restrictive covenant."

The Tambussi letter is ambiguous as to the specific obligations from which Hill is

released.  Although it clearly releases Hill from "any restrictive covenants," it does not indicate

which of Hill's negative obligations qualify as such.  Neither does the language of the

Employment Agreement shed any light on the meaning of the release as the Employment

Agreement does not explicitly designate any of Hill's negative obligations as "restrictive

covenants."  The mere fact that the caption of the covenant not to compete at Paragraph 15.3

contains a permutation of the word "restrictive"; whereas the captions to Paragraphs 15.1 and

15.2 do not, does not preclude the possibility that the confidentiality and do-no-harm covenants

at Paragraphs 15.1 and 15.2 are "restrictive covenants" for purposes of the Tambussi Letter.

It is also not the case that the term "restrictive covenant" has such a fixed, immutable definition so as to render an inquiry into the meaning behind the term unnecessary.  On the one hand, Black's Law Dictionary defines restrictive covenants narrowly as clauses "which limit a contract party after termination of the contract in performing similar work for a period of time and within a certain geographical area."  Black's Law Dictionary 1315 (6th ed. 1990).  On the other hand, courts – including our own Third Circuit – have used the term to refer to negative covenants other than covenants not to compete.  See Halper v. Halper, 164 F.3d 830, 841 (3d Cir. 1999) (referring to "a restrictive covenant of non-disclosure and noncompetition"); Continental Group, Inc. v. Amoco Chemicals Corp., 614 F.2d 351, 354 (3d Cir. 1980) (characterizing covenant not to disclose confidential information as "restrictive covenants").  Thus, actual use of the term indicates that it is susceptible to a broader meaning.  Finally, the plural language of the Tambussi Letter itself corroborates the assertion that Plaintiffs may have meant to release Hill from more than just his obligation not to compete.

In sum, the language of the Tambussi Letter is reasonably susceptible to multiple meanings, and the Court has not been presented with evidence of what the parties actually meant by the phrase "all restrictive covenants."  Accordingly, the Court cannot hold that Hill has or has not been released from his obligations pursuant to Paragraphs 15.1 and 15.2.

### 2.    Paragraph 15.1:  Company Information

Hill argues that he has not violated Paragraph 15.1 because none of the information utilized in the BAI Presentations constitutes "company information."  The Employment Agreement defines "company information" as "all data relating to Commerce's business that is

not generally published or available to the public . . . ."  (Def.'s Mot. for Partial Summary Judgment on Count Six at Ex. A.)  Hill asserts that all of the information contained in the BAI Presentations was either generally published or available to the public because (1) Plaintiffs have registered the alleged company information with the United States Copyright Office; and (2) the information has been generally published or available to the public from a variety of sources such as Harvard University Business School; the Federal Deposit Insurance Corporation; www.bankstocks.com; a JD Power 2006 Retail Banking Satisfaction Study; Commerce's previous website; and several articles from publications such as Philadelphia Magazine and the ABA Banking Journal.

### i.      Copyright Registrations

Hill has produced Certificates of Registration from the United States Copyright Office showing that Plaintiffs registered copyrights with respect to the 2005 Annual Report, the 2006 Annual Report, and the Commerce Bancorp Officer Orientation Report.  (Def.'s Mot. for Partial Summary Judgment on Count Six at Ex. G.)  The annual reports were registered on November 17, 2008, and according to the certificates, were first published on April 1, 2006 and April 1, 2007, respectively.  The Officer Orientation Report was registered on November 18, 2008; and according to the certificate, was first published on April 24, 2007.  Hill does not produce documentation that the Commerce University slide-show presentation was ever registered.

Hill argues that the information contained in these reports is no longer company information because the reports themselves became available to the public upon registration. Hill further argues that the information contained in these reports is no longer company information because the certificates state that the reports were first "published" before the BAI

38

Presentations.  Plaintiffs do not directly respond to Hill's first argument that the reports were available to the public a la the Copyright Office.  Instead, Plaintiffs argue that Hill should not be able to benefit from the allegedly public nature of the reports because he forced their hand into registration by infringing in the first place.  As to Hill's second argument, Plaintiffs argue that the Officer Orientation document was only ever used internally and never published to the public.

Hill has not met his burden of demonstrating that the allegedly copyrighted works were "generally published or available to the public."  Hill offers no proof that the Copyright Office has actually retained the documents subject to copyright registration.[16]  He offers no proof that, if retained, these documents were accessible to the public at large.  See, e.g., 37 C.F.R. § 201.2(b)(1) (observing that some deposits may not be stored on the immediate premises of the Copyright Office).  Neither does he explain the hoops through which a member of the public would have to jump in order to gain access to these particular documents.  As a consequence, Hill has not provided any basis to decide that the ordeal is of such a nature as to render the documents "available to the public" under any reasonable construction of the contractual language.  Rather, Hill appears to rely solely on the proposition that because Certificates of Registration have issued, the documents underlying these certificates must be "available to the public" for purposes of the agreement.  The Court does not believe such a bare-bones showing sufficiently demonstrates the absence of a factual dispute on the issue of public availability.

Similarly, Hill's argument that the information was "generally published or available to

---

[16]  The Court is cognizant that seekers of copyright registration generally must deposit a copy or copies of the allegedly copyrighted works with the Copyright Office.  See 17 U.S.C. § 408; 37 C.F.R. § 202.20.  But see 17 U.S.C. § 408(c)(1) (authorizing Register of Copyrights to waive by regulation deposit requirement in certain cases).

the public" because Plaintiffs listed a "first publication date" on their copyright registration

applications does not show the absence of a factual dispute regarding public availability.

Publication is a statutory term of art defined as:

> [T]he distribution of copies or phonorecords of a work to the public by sale or
> other transfer of ownership, or by rental, lease or lending.  The offering to
> distribute copies or phonorecords to a group of persons for purposes of further
> distribution, public performance, or public display constitutes publication.

17 U.S.C. § 101.  Even if Plaintiffs distributed copies of the registered works to the public by

sale or otherwise, that does not necessarily mean that the documents were "generally published or

available to the public."  Hill offers no proof, for example, of how many copies were distributed

or to whom they were distributed.  In other words, that the works were "published" for copyright

purposes does not necessarily lead to the conclusion that the works were "generally published or

available to the public" for purposes of the Employment Agreement.[17]  Accordingly, Hill's

copyright registration arguments, for the purposes of this motion, do not demonstrate that the

information he disclosed through the Presentations was no longer "company information."

### ii.    Other Public Sources

Hill's argument that much of the information contained in the BAI Presentations is, and

has been for some time, part of the public domain does come closer to the mark.  Hill has

produced several articles from various sources including the Harvard Business School,

Philadelphia Magazine, and the ABA Banking Journal that report on much of the subject-matter

discussed by Hill during the Presentations.  In an effort to demonstrate that all of the information

contained in the Presentations has been generally published or is otherwise available to the

---

[17]  Accordingly, the Court need not reach Plaintiffs' facially troubling contention that the
Marks were only published internally.

public, Hill's brief provides "some examples" from the First BAI Presentation of slides that reproduce information allegedly in the public domain.  For example, slide seven apparently contains the same information from slide six of the JD Power 2007 US Client Services Meeting, which information was apparently made publically available in an article entitled Lending Convenience published by an organization known as Convenience Store Petroleum (CSP) as well as by a presentation at the Association for Corporate Growth in September of 2006 and a November 2006 Samford Bernstein Presentation.  The remainder of the "examples" provided by Hill attempt to connect certain BAI Slides with various publications, presentations, or submissions to government agencies to support the notion that the information contained in these slides was publically available.

Plaintiffs object to this line of argument by contending that extracting, compiling, and disclosing information from multiple, obscure published sources does not constitute disclosing information "generally published or available to the public."  As an initial matter, the Court is not convinced by Plaintiffs' compilation argument.  If the information was generally published or available to the public, Hill was not restrained from disclosing it; that he compiled a mass of allegedly public information and disclosed it at once does not alter its allegedly public character and thus is of little moment to the instant analysis.[18]

That said, Plaintiffs' obscurity argument is better-taken.  Although some of the information sources cited by Hill are quite clearly generally published and available (Philadelphia Magazine, for example, is available at many newsstands and convenience stores), other

---

[18]  Such acts of compilation may have nonetheless violated his duty under Paragraph 15.2 of the Employment Agreement not to engage in any conduct harmful or inimical to Commerce Bank's interests.  The Court addresses this issue below at § III.C.3.

information sources smack of obscurity. For example, and in stark contrast to Philadelphia

Magazine, most members of the public are unlikely to even know of the existence of <u>Lending</u>

<u>Convenience</u> (published as it were by Convenience Store Petroleum) let alone where to go to get

a copy. Moreover, some of the information sources cited by Hill do not appear to be publications

at all; rather, some appear to be presentations given at various conferences.

      Ultimately, the Court need not determine on the instant motion which of the information

sources cited by Hill have published the relevant information in such a way as to render it

"generally published or available to the public" because Hill's application suffers from a more

fundamental flaw. Quite in keeping with the piece-meal manner in which this controversy has

been litigated, Hill provides only "some examples" of slides from the First BAI Presentation that

he asserts contain non-company information, notwithstanding Plaintiffs' position that all (or at

least substantially all) of the slides divulge confidential company information. Specifically, Hill

discusses only slides seven, eight, ten, twelve, seventeen, and twenty-five. He does not link the

remaining seventeen slides with generally published or publically available information or

explain away his failure to do so. Moreover, he does not expressly link any portions of the

transcript of his verbal remarks made at the BAI Presentation to publically available information.

Of course, he does not even discuss the information allegedly contained in the other presentations

that form the basis of this lawsuit. Accordingly, Hill has not met his burden of demonstrating to

the Court that <u>all</u> of the information he disclosed was non-company information.[19]

      **3.     Paragraph 15.2:  No Harmful or Inimical Conduct**

---

[19] To the extent Hill has invited the Court to grant summary judgment on a slide-by-slide basis, the Court respectfully declines.

Even if Hill had addressed all of the slides and remarks made in all relevant Presentations and had demonstrated that all of the information contained in those slides and remarks was "generally published or available to the public," Hill would still have to demonstrate that the disclosures did not violate his alleged obligations under Paragraph 15.2.  As noted, Paragraph 15.2 generally prohibits Hill engaging in any conduct that he reasonably believes would harm or be inimical to the interests of Commerce Bank "during the Term."  For purposes of the Employment Agreement, "the Term" means "the original five-year employment period, as well as any renewed or extended periods as provided for" in the Employment Agreement.  (Def.'s Mot. for Partial Summary Judgment on Count Six, Ex. A. at ¶ 1.3.)  Hill argues that the Period ended when his employment was prematurely terminated; whereas, Plaintiffs argue that the Period ends on January 1, 2011, which is the date upon which Hill's Employment Agreement would have expired had he not been sacked.

The terms of the Employment Agreement do not make clear whether Hill's obligations under Paragraph 15.2 expired upon his termination or on January 1, 2011.  This is so, at least in part, because the Employment Agreement does not define "the original five-year employment period."  On the one hand, the fact that the Period is defined as a "five-year" period suggests that the Period expires in 2011.  On the other hand, the fact that the Period is defined as the "employment period" suggests that the Period expired when Hill's employment expired.  This ambiguity makes summary judgment on this point in Hill's favor inappropriate at this time.  Accordingly, even if the Court were to hold that Hill disclosed no company information, Plaintiffs could still make a plausible argument that Hill's compilation and presentation of such information to promote a competitor bank constituted conduct harmful to Commerce Bank and

thus breached Hill's obligations pursuant to Paragraph 15.2 of the Employment Agreement.

To recap, Partial Summary Judgment on Count Six will be denied at this time because the record is premature and Hill's showing is incomplete.  There remains a factual dispute over whether Plaintiffs released Hill from his obligations under Paragraphs 15.1 and 15.2.  Hill has not demonstrated that all of the copyrighted documents were "available to the public" (whatever meaning that term has for purposes of the Employment Agreement) by way of the United States Copyright Office.  Hill has not demonstrated that Plaintiffs' alleged publication of the copyrighted works satisfies the "generally published or available to the public" language of Paragraph 15.1.  Hill has not demonstrated that all of the slides in the BAI Presentations and the other presentations that form the basis of this action contain only non-company information.  Even if Hill were to have made such a complete showing, summary judgment would not necessarily be avoided because compiling and distributing significant amounts of internal Commerce Bank documents to promote a competitor bank is arguably conduct harmful or inimical to Commerce Bank's interests, and Hill has not demonstrated that his Paragraph 15.2 do-no-harm obligations have run.

**IV.     CONCLUSION**

For the reasons expressed above, Hill's motion to dismiss will be denied.  Hill's motion for partial summary judgment on counts one through five will be granted as to Plaintiffs' trademark claim predicated on the Second BAI Presentation.  Hill's motion for partial summary judgment on counts one through five will be denied in all other respects.  Hill's motion for partial summary judgment on count six will be denied.  An appropriate Order shall enter.

Dated: 6-18-2010                                               /s/ Robert B. Kugler
                                                                          ROBERT B. KUGLER
                                                                          United States District Judge

45